Robert L. MILLER

v.

UNITED STATES of America.

Civ. Action No. S75–27(N).

United States District Court,
S. D. Mississippi, S. D.

Sept. 23, 1976.

John M. Sekul, Biloxi, Miss., for plaintiff.

Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

This tort action against the United States was brought pursuant to 28 U.S.C. §§ 1346(b) and 2674, and is based on the alleged medical malpractice of government employees in treating the plaintiff at the Biloxi-Gulfport, Mississippi Veterans Administration Center from January 1971 through June 18, 1971 and from the latter date through June 5, 1972. More specifically, the plaintiff alleges that medical doctors at the above facility negligently administered a drug known as Vistaril, a tranquilizer used in the treatment of those suffering from nervous disorders, which undisputably produced antihistaminic effects.

Prior to trial, this Court denied the defendant's Motion for Summary Judgment, and this case is now ripe for decision. The government has interposed two defenses to this action, namely, lack of jurisdiction in that this action is barred by the two-year statute of limitations set forth in 28 U.S.C. § 2401(b) contending that the plaintiff did not file his administrative claim within two years of the time that the cause of action accrued; and in the alternative, that no employee of the government was negligent in administering Vistaril to the plaintiff, but even assuming negligence, that the plaintiff failed to prove causation. The above jurisdictional and merits defenses were the bases for the defendant's motions to exclude and enter judgment after the plaintiff rested and again after both sides rested. The Court reserved ruling on the government's motions and now determines that they should be and will be denied because of the following reasons.

### THE FACTS

The facts giving rise to this litigation are relatively simple and undisputed. The plaintiff, Robert L. Miller, a World War II Army veteran and former prisoner of war of Germany for three and one-half months in late 1944 and early 1945, contracted epididymytis of the left testicle while incarcerated in a prisoner of war camp. In 1959 he had a recurrence or flareup of the epididymitis resulting in an epididymectomy requiring the surgical removal of his left testicle.

In January, 1971 Mr. Miller entered the Gulfport Veterans Administration Center for the treatment of his nerves and bronchitis and was treated for emphysema and an anxiety or nervous condition for approximately 30 days. The admitting physician was Dr. Ellen M. Lessmann and the treating physician was Dr. W. W. Dreher.

It is established by the undisputed testimony of the plaintiff, which is supported by the medical records of the defendant (Exhibit P-3), that upon being admitted to the Gulfport VA Hospital he informed the defendant's employees that he was suffering from service-connected disability because of nervousness, bronchitis, malnutrition and epididymitis. He informed Doctors Lessmann, Dreher and a registered nurse that he had previously been taking self prescribed antihistamines and had noted that they slowed down or affected his ability to urinate and thus he was allergic to them and could not take this type drug.

On February 2, 1971, plaintiff was discharged from the hospital with a month's supply of prescribed medicine, including Vistaril and Stelazine, both tranquilizer-type drugs used in the treatment of various psychiatric disorders, Vistaril admittedly having antihistamine properties and effects. It was prescribed that Mr. Miller take one hundred milligrams of Vistaril four times a day, which he took in February and part of March, 1971. Because of his inability to urinate properly he returned to Dr. Lessmann who lowered his dosage from 100 to 75 milligrams four times a day. In April, 1971, he again complained to Dr. Lessmann and she at that time changed his medication from Vistaril to other tranquilizers, none of which contained antihistaminic properties or caused antihistaminic effects. In May or June, 1971, when his complaints persisted, Mr. Miller returned to Dr. Lessmann, who at that time discontinued all medication.

In late May or early June, 1971, the plaintiff sought the medical attention of a pri-

vate physician, Dr. Rubenstein of Ocean Springs, Mississippi, who found that he had a serious infection of his prostates or epididymides and prescribed a sulfa drug. Inasmuch as he could not afford to pay a private physician for continued treatment, Miller returned to Dr. Lessmann on June 18, 1971, and she in turn sent him to Dr. D. Lyle Robertson, a urologist at the Biloxi VA Hospital. This urologist examined the plaintiff and then admitted him to the hospital on or about June 21, 1971 and catheterized him for a period of three weeks. After the catheter was removed Plaintiff's bladder did not return to normal and an indwelling Foley catheter was inserted which remained in plaintiff almost continuously for a period of four years and nine months.

This indwelling catheter caused plaintiff's penis to become and remain raw and resulted in calcium formations therein which would cut like glass, causing bleeding and severe pain, preventing him from having any intercourse with his wife during that time and seriously affecting his ability to sleep or engage in any social or recreational activities because of pain and irritation. Mrs. Miller, a licensed practical nurse, had to remove and replace the catheter with a new one each week, and many times had to physically remove the calcium deposits from plaintiff's penis. Because of his pain and discomfort, the plaintiff was required to ask for and was given a lighter job at Keesler Air Force Base with a small undetermined reduction in earnings. He was advised by Dr. Robertson that he would have to wear the catheter for the rest of his life.

In March, 1976, the plaintiff developed a severe infection in his right testicle area and was again hospitalized by Dr. Rubenstein who called in Dr. Robert Carter, a urologist of Biloxi, Mississippi, who saw Mr. Miller in consultation on March 24, 1976. After a complete examination of the plaintiff who was still wearing the Foley catheter, Dr. Carter performed an operation on Mr. Miller consisting of a transurethral resection of the prostate, removing seven

grams of tissue together with bladder stones. After the above surgery, the catheter was permanently removed, resulting in plaintiff's condition gradually improving to the extent that he can now void almost normally and sometimes have normal sexual relations with his wife, although he is unable to reach a sexual climax. At this time the plaintiff is experiencing very little pain or discomfort.

### THE STATUTE OF LIMITATIONS

The threshold jurisdictional question to be decided is whether the applicable statute of limitations, 28 U.S.C. § 2401(b), is a bar to the plaintiff's cause of action. In relevant part it states:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . .

It is uniformly held that causes of action for personal injury under the Federal Tort Claims Act do not accrue until they are discovered or in the exercise of reasonable diligence should be discovered. *Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962). In medical malpractice actions, the claim "accrues" when the claimant discovers, or in the exercise of reasonable diligence should have discovered the acts constituting the alleged malpractice upon which the cause of action is based. *Quinton v. United States, supra* at 240; *Reilly v. United States*, 513 F.2d 147, 148–149 (8th Cir. 1975); *Jordan v. United States*, 503 F.2d 620, 622 (6th Cir. 1974); *Toal v. United States*, 438 F.2d 222, 224–225 (2nd Cir. 1971).

The question of when a medical malpractice cause of action "accrues" must necessarily be decided by the trier of fact based upon the particular facts of each individual case. This we shall now proceed to do.

As previously noted, the evidence is undisputed that when the plaintiff was admitted to the VA hospital in Gulfport, Mississippi on January 4, 1971 he specifically informed his admitting and treating physi-

cian, as well as a registered nurse attending him that he was "allergic to antihistamines". This is evidenced by the VA hospital record in evidence as Exhibit P-3, which in part reads, "He has apparently been taking antihistamines at his own discretion and claimed they slowed down his urination and he couldn't take them anymore." It is further undisputed that Vistaril, a tranquilizer type *drug which* unquestionably has antihistaminic effects, was prescribed by his treating physician, Dr. Dreher, and that the plaintiff took 400 milligrams of Vistaril a day in addition to the other medication prescribed by the VA, none of which have any antihistaminic effects or properties. Other tranquilizers, such as valium and librium, contain no antihistaminic properties or effects. Because of his inability to completely void, resulting in discomfort and pain, Mr. Miller returned to the VA hospital where Dr. Lessmann reduced the prescribed dosage of Vistaril to 300 milligrams per day and subsequently discontinued it.

By June, 1971, Mr. Miller "had a feeling" that the medication he was taking was contributing to or causing his urinary problems and admittedly, Dr. Robertson, the VA urologist, who placed the indwelling catheter in him in June, 1971, at or near that time informed the plaintiff that his "nerve medicine" had caused his problem. However, the uncontroverted evidence in this case is that the plaintiff was not aware that the Veterans Administration, contrary to his admonition, had prescribed a drug with antihistaminic effects, which for the first time was discovered by the plaintiff's wife on or about June 14, 1972 when she read of Vistaril's effects in the Physicians' Desk Reference.

Plaintiff filed his administrative claim on April 24, 1974, which was denied on August 6, 1974, and the Complaint was filed herein on February 4, 1975.

This action was begun within six months after the date of the mailing of the final denial of the administrative claim, and thus the question to be decided is whether the administrative claim was presented or filed within two years after its accrual.

Certainly one who knows that he has suffered damage from medical malpractice may not postpone bringing an action until the full extent of that damage is ascertained. *Toal v. United States, supra* at 225. However, the true test to be applied in making the determination of when a "claim accrues" against the government, and consequently, the statute of limitations *begins to run*, is when the claimant discovered or in the exercise of reasonable diligence should have discovered *the acts constituting the alleged malpractice. Jordan v. United States, supra* at 622; *Toal v. United States, supra* at 225. The alleged act of malpractice charged by the plaintiff herein is not the administering of "nerve drugs" per se or any other medication that was prescribed and administered, but rather, the prescribing and administering of an antihistamine drug or one that possessed antihistaminic properties or caused antihistaminic effects, with actual knowledge on the part of the defendant's employees of the deleterious effect of such drugs on plaintiff's urinary system or bladder. Plaintiff did not learn of, nor should he as a layman in the exercise of reasonable care have learned of and been charged with knowing or discovering in the exercise of reasonable diligence that the drug Vistaril prescribed by these doctors, who had been made aware of the plaintiff's allergy, contained antihistaminic properties or produced antihistaminic effects, until his wife read and told him thereof.

Thus, it was not until June 14, 1972 that the plaintiff's cause of action accrued, because that was the time when he first should have been aware in the exercise of *reasonable diligence that his injury could be* the result of a *tortious act* committed by a physician. *See Jordan v. United States, supra* at 623. Plaintiff filed his administrative claim within two years of June 14, 1972, when he first was charged with knowledge of facts sufficient to alert a reasonable person that there may have been negligence or malpractice, and thus this claim is not barred by the two year statute of limitations.

## THE MERITS

### A. LIABILITY

■ Turning now to the merits of this claim, it is necessary to determine whether the plaintiff has proved by a preponderance of the evidence negligence on the part of the defendant's employees which proximately caused or proximately contributed to cause his alleged injuries, sufferings and damages.

Mr. Miller, the plaintiff, was the only witness to testify before this Court on the question of liability or negligence; that is, the government did not call any witness to refute the plaintiff's testimony, but merely presented deposition testimony of a urologist in Jackson, Mississippi, who testified to hypothetical questions based principally upon plaintiff's VA hospital record. His testimony was much more favorable to the plaintiff than to the defendant. Plaintiff's credibility was not questioned in this trial and his testimony was not rebutted.

Without repeating all of the undisputed evidence concerning the actual knowledge by the defendant's doctors and nurse with reference to the harmful effect of antihistamines on plaintiff's urinary condition as related to them by him and the fact that the attending doctor prescribed Vistaril, which they knew or through the exercise of reasonable care as skillful physicians should have known had antihistaminic effects, this Court finds that these government employees were negligent and their negligence is chargeable to the defendant.

### B. CAUSATION

This Court rejects the defendant's contention that the plaintiff failed to prove by a preponderance of the evidence that the administering of the drug Vistaril proximately caused plaintiff's complained of injuries, sufferings and damages. Although the plaintiff had epididymitis in 1944 and 1945 while a prisoner of war, which resulted in removal of his left testicle in 1959, he at no time suffered any urinary problem, that is, any problem emptying his bladder, except for a brief thirty day period sometime

prior to 1971 while he was taking antihistamines, which led him to discover the harmful effect of antihistamines on his bladder. Shortly after he began taking the prescribed Vistaril, Miller began experiencing inability to completely void or empty his bladder, which subsequently led to the insertion of the catheter which remained in his body for over four years.

Dr. Robert Carter, the well qualified and impressive urologist who testified as a witness for the plaintiff and whose operation resulted in the permanent removal of the catheter and the dramatic improvement of the plaintiff thereafter, was of the opinion that Vistaril probably caused the bladder damage characterized as a distended or flaccid neurogenic bladder, that is, one paralyzed so that it has poor tone and ability to contract because of interference with its nerve supply.

The defendant's expert testimony supports, rather than contradicts, Dr. Carter's opinion. Dr. Robertson's medical entry reflects in part that ". . . it was felt that the patient had paralysis of the bladder, partial, flaccid, probably due to medication." (Exhibit P-4). In his deposition admitted as Exhibit P-5, Dr. Weems, the expert who was deposed by the defendant was apparently of the same opinion. (see pp. 18–21, 23, Exhibit P-5).

This Court thus concludes that the evidence preponderates that the negligent prescribing of the drug Vistaril with its antihistaminic effect proximately caused plaintiff's complained of injuries, sufferings and damages.

### C. DAMAGES

It is unquestionable that Dr. Carter's March 31, 1976 operation on the plaintiff was successful, inasmuch as it resulted in the removal of the irritating and painful catheter which had been placed in Mr. Miller's penis when he was 46 years of age. The removal of the catheter has resulted in the plaintiff's being able to void and have sexual relations with his wife, as well as his apparent ability to more normally partici-

pate in social and recreational activities. However, this Court finds, in accordance with Dr. Carter's testimony, that although the infection has cleared, the plaintiff "may well have some neurogenic bladder still" but that this could not be verified because of the risk of creating another infection.

This Court finds that the plaintiff's serious and painful injuries were solely and proximately caused by the negligence of the defendant, entitling the plaintiff to a judgment against the defendant for compensatory or actual damages in the sum and amount of $20,000.00.

A Judgment conforming with these findings of fact and conclusions of law, approved as to form by counsel for both sides, shall be presented to this Court at Biloxi, Mississippi within the time required by the Local Rules of this Court.